**IN THE**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

---------------------------------------------------------------X

WILLIAM S. SHANAHAN and
ANTARES, LLC,

Plaintiffs,

-against-

MAURICE VALLAT, JAMES COLLINS-TAYLOR,
LOUIS BOWEN, ACL NOMINEES LTD. ACL
HOLDINGS LIMITED and ACL ASIA LIMITED,

Defendants.

---------------------------------------------------------------X

JAMES COLLINS-TAYLOR, LOUIS BOWEN,
ACL NOMINEES LTD., and ACL HOLDINGS
LIMITED,

Third-Party Plaintiffs,

-against-

ROSE-MARIE FOX,

Third-Party Defendant.

---------------------------------------------------------------X

MISC 05 0093 - ML

Case pending in the
U.S. District Court, S.D.N.Y.
03 Civ. 3496 (MBM)

**OBJECTION OF WILLIAM S. SHANAHAN AND ANTARES, LCC, TO MOTION OF MONTROSE INTERNATIONAL HOLDINGS LIMITED (BVI) TO QUASH THE SUBPOENA**

Pursuant to Fed. R. Civ. P. 45(c) plaintiff and third party defendants William Shanahan and Antares, LLC object to the motion of Montrose International Holdings Limited (BVI) (Montrose Holdings) to quash the subpoena served upon Montrose Holdings in Rhode Island. The facts and support of this objection are set out in the attached memorandum of law and affidavit of Steven I. Locke.

Dated:
August 16, 2005

Respectfully submitted,
*Attorneys for Plaintiffs & Third-Party Defendant William S. Shanahan and Antares LLC,*

Richard Nadeau, Jr. (No. 2861)
Nadeau & Simmons, P.C.
56 Pine Street
Providence, Rhode Island 02903
Ph: (401) 272-5800
Fax: (401) 272-5858

Thomas J. Cronin (No. 5302)
Gunning & LaFazia, Inc.
56 Pine Street
Providence, RI 02903
Ph: (401) 521-7977
Fax: (Fax) 521-6901

CARABBA LOCKE LLP
Steven I. Locke (SL 4859)
100 William Street, Suite 310
New York, New York 10038
(212) 430-6400

Certificate of Service

I hereby certify that I am over 18 years of age and not a party to this action. On August 16, 2005, I caused to be served the foregoing Objection to the Motion to Quash of Montrose International Holdings Limited (BVI) by regular mail upon Geoffry w. Millsom, Adler Pollock & Sheehan, P.C., One citizens Plaza, 8th Floor, Providence RI 02903 and Marc Kasowitz, Christopher Johnson, and Courtney Ozer Dichristfaro, Kasowitz, Benson, Torres & Friedman, LLP. 1633 Broadway, NY, NY 10019.

**IN THE**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

-----------------------------------------------------------------X

WILLIAM S. SHANAHAN and
ANTARES, LLC,

Plaintiffs,

-against-

MAURICE VALLAT, JAMES COLLINS-TAYLOR,
LOUIS BOWEN, ACL NOMINEES LTD. ACL
HOLDINGS LIMITED and ACL ASIA LIMITED,

Defendants.

-----------------------------------------------------------------X

JAMES COLLINS-TAYLOR, LOUIS BOWEN,
ACL NOMINEES LTD., and ACL HOLDINGS
LIMITED,

Third-Party Plaintiffs,

-against-

ROSE-MARIE FOX,

Third-Party Defendant.

-----------------------------------------------------------------X

MISC 05 0093 - ML

Case pending in the
U.S. District Court, S.D.N.Y.
03 Civ. 3496 (MBM)

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO QUASH**

**PRELIMINARY STATEMENT**

The motion to quash in this securities fraud litigation is based on two arguments, both without merit. Initially, Montrose International Holdings Limited (BVI) ("Montrose") argues that this Court lacks personal jurisdiction to enforce a subpoena served on its President, David Henderson, in Rhode Island. In order to maintain this argument Montrose ignores five critical issues: (1) that Montrose's own documents expressly state that its "USA Offices" are located at the address in Rhode Island where Mr. Henderson was served; (2) in any event, the address where Henderson was served is his home; (3) that the subpoena is specifically issued to David Henderson, Montrose's President and an investor, not the company generally; (4) that regardless of Henderson's home or work address, Montrose admits to Henderson conducting business from the address where Henderson was served in Rhode Island; and (5) that where a corporate officer is served with a subpoena for his testimony at his residence in Rhode Island, the law does not require any analysis as to the level of contact his company is doing in Rhode Island—the Court has personal jurisdiction over the witness and the company as a matter of law—this is basic tag jurisdiction.

Apparently recognizing the weakness of its jurisdictional argument, Montrose contends that the subpoena should also be quashed because Plaintiffs are doing nothing more than engaging in a "fishing expedition." This is simply untrue. As set forth in more detail below and the accompanying Affidavit of Steven I. Locke ("Locke Aff."), Plaintiffs, as the result of their investigation conducted for the purpose of this litigation, have reason to believe that Mr. Henderson, as not only the President, but also as an investor in Montrose, a company under Defendants' complete control, has been a victim

of the same type of fraud claimed in Plaintiffs' Amended Complaint, and as such, his testimony would be not only material and relevant to this case, but admissible at trial as evidence of Defendants' fraudulent intent. Accordingly, the motion to quash should be denied in its entirety, and the witness, David Henderson, should be directed to produce responsive documents and appear for his deposition.

## STATEMENT OF FACTS[1]

**Background to the Motion**

As a preliminary matter, the Court should be aware that on July 22, 2005, Plaintiffs' counsel received a call from Montrose's attorneys asking Plaintiffs to withdraw the subpoena and stating that otherwise Montrose would move to quash. Montrose's counsel further explained that the documents requested were voluminous and located mostly in China. Plaintiffs declined to withdraw the subpoena but offered to accept only those responsive documents located in Rhode Island along with Mr. Henderson's testimony, and then make a further document request if that proved appropriate depending on the results of the deposition. Montrose's attorneys declined and then requested an extension of time to file the motion to quash and Plaintiffs consented. During the conversation, Plaintiffs' counsel specifically asked Montrose's attorneys whether they also represented David Henderson individually because the subpoena was addressed to him specifically, not Montrose generally. The reason it was addressed to Mr. Henderson at a Montrose address in Rhode Island is that Montrose identifies the Rhode Island address as it "USA offices" on its internet website freely available to anyone with internet access. See Locke Aff. Tab A (internet printout). If

[1] The Statement of Facts is taken from the Affidavit of Steven I. Locke submitted herewith, along with the attachments.

Plaintiffs had thought that this was Henderson's home, the subpoena would have been addressed to him there personally. In any event, counsel responded that he would look into it and follow up. He did not. At this point, Plaintiffs now reiterate to the Court that they seek both documents and deposition testimony from David Henderson specifically, not Montrose generally, because they believe that he has information relevant and material to Plaintiffs' claims.

**Plaintiffs' claims**

As set forth in the Amended Complaint, Plaintiffs instituted the above captioned securities fraud action in the United States District Court for the Southern District of New York, alleging that they were fraudulently induced to invest in a company known as Phoenix Telecommunication Limited ("Phoenix" or the "Company"), which is in the business of financing a paging project in China. See Locke Aff. Tab B (Amended Complaint).

Plaintiffs claim that they were fraudulently induced to make their investments, totaling $3,737,906, by certain financial statements concerning the Company. These financial statements were compiled and provided to Plaintiffs by Defendants: Maurice Vallat, Phoenix's Chairman of the Board of Directors (the "Board") at all times relevant to Plaintiffs' claims; ACL Nominees Ltd., ACL Holdings Limited and ACL Asia Ltd., (collectively "ACL") which acted as the Company's corporate secretary, financial advisor and escrow agent, compiling Phoenix's financial statements for the years 1998 and 1999; James Collins-Taylor, ACL's Executive Director (and a Phoenix Board member from June 1998 until May 21, 2001); and Louis Bowen, ACL's founder and Managing Director. Collins-Taylor and Bowen maintain day-to-day

control over ACL. Through ACL, Collins-Taylor and Bowen exerted tremendous influence over Phoenix, and they were intimately involved in the Company's financial activities, maintaining exclusive control over Phoenix's accounts and corporate books. (ACL, Bowen and Collins-Taylor are collectively referred to as "Defendants").

Beginning in December 1999, when Phoenix was experiencing financial difficulties, Shanahan was approached by his wife, Third-Party Defendant Rose-Marie Fox, who also sat on Phoenix's Board, to inquire as to whether he would be interested in investing in the Company. Shanahan responded that he would consider it, but that he wanted, among other things, to review Phoenix's financial statements first.

On March 23, 2000, Shanahan was provided with financial statements for the years 1998 and 1999. These statements, which were the first ever produced for Phoenix, were compiled by ACL, controlled by Collins-Taylor and Bowen, and approved and forwarded to Shanahan by Vallat. Based on these financial statements, Shanahan invested a total of $2.2 million between March and October 2000. In November 2000, Phoenix produced another set of financial statements current through October 31, 2000. These statements were compiled by Vallat and provided to Shanahan for the purpose of allowing him to consider whether to provide further funding to Phoenix. Based on the 1998, 1999 and 2000 financial statements, Shanahan, and later Antares, LLC, invested an additional $1,537,906.

More recently however, it has become clear that these financial statements, provided by Defendants, contain material omissions and misrepresentations, all of which would have impacted Plaintiffs' investment decisions with respect to Phoenix had the truth been known, and that Defendants have engaged in other fraudulent

conduct. Among this conduct is that Defendants tampered with Phoenix's share register for their own benefit and the benefit of their clients, all to the detriment of the other shareholders, including Plaintiffs.

Other suspicious conduct includes ACL commingling Phoenix's funds in a general account with the funds of other corporations unrelated to Phoenix but in which ACL, Collins-Taylor and Bowen maintain an interest. This commingling made it difficult, if not impossible, to monitor how ACL was spending the Company's capital. Plaintiffs have learned however, that this commingling permitted Defendants to take Phoenix's funds unlawfully and loan them to another company known as Green Cartridge Corp. ("GCC") for GCC's benefit during September and October 1999 without Phoenix's knowledge or consent. GCC has no relationship to Phoenix whatsoever.

Further, because ACL controlled Phoenix's financial accounts, Bowen and Collins-Taylor were able to take for themselves a $25,000 commission from Phoenix to satisfy a debt purportedly owed by a predecessor corporation, SinoAmerican Telecomm Inc., for fundraising in December 1998. Bowen, Collins-Taylor and ACL took this money from Phoenix despite the fact that Sino and Phoenix are separate companies and knowing that Sino was going through liquidation proceedings in the Hong Kong Court, proceedings which they themselves instigated, and where claims against Sino should have been filed. Further, all funds raised by ACL for Sino had been returned to the investors in February 1998, months prior to ACL taking these fees and prior to Phoenix's formation, and ACL knew this because it controlled Sino's escrow account at this time. As a result, in accordance with common corporate fundraising practice, ACL was never owed any commission by Sino or Phoenix. In any event, this payment was never

disclosed in any of the Company's financial statements provided to Plaintiffs and was not discovered until an audit was conducted of the general ledger maintained by ACL.

Another example of ACL's manipulation was that it was able to have Phoenix pay the entire salary of one of its employees, Christopher Page, from October 1998 through September 1999, despite the fact that Page only spent a fraction of his time working as a "consultant" on Phoenix-related matters. This salary arrangement was contrary to ACL's agreement with the Company that Phoenix would only pay that portion of Page's salary that corresponded with the percentage of his time he spent actually working for Phoenix. This alternate arrangement occurred without being disclosed to anyone on the Board of Directors or in the financial statements.

On December 19, 2002, Phoenix terminated Defendant Vallat for poor performance and a variety of other improprieties. In November 2002, prior to Vallat's termination, he attempted to negotiate a severance package on his own behalf. After these negotiations, Plaintiffs learned for the first time that Vallat purportedly had a formal employment contract with Phoenix's wholly owned subsidiary, Phoenix Telecommunication(Hong Kong) Limited ("Phoenix(HK)") dated February 1, 2000 and signed by Collins-Taylor and Vallat. According to the terms of this contract, Vallat was to work full-time and be paid $9000 per month in salary. Neither Vallat, nor Collins-Taylor, ever told the Phoenix Board of Directors about this contract prior to December 2002 in an effort to hide this lower salary from the Company and allow Vallat to obtain higher compensation, which he did. The only reason the contract was ever disclosed was because in March 2002, Phoenix(HK)'s corporate secretary, an outside accounting firm

controlled by Vallat, needed the contract so that Vallat could obtain work papers to stay in Hong Kong.

On January 30, 2003, Vallat commenced an action in the Labour Tribunal of Hong Kong (the "Tribunal"), LBTC No. 925 of 2003, against Phoenix, in which he claimed for the first time that he was entitled to back wages for the years 1998 through 2002 ("Hong Kong Proceedings"). These claims were based on Vallat's assertion that his salary during this period was $13,833 per month, as opposed to the lower amounts reported in the Company accounts. This claim was never disclosed to the Phoenix Board prior to these proceedings despite years of alleged underpayment and was not identified as a liability or otherwise in any of Phoenix's financial statements issued by Defendants and forwarded to New York for Shanahan's review. Collins-Taylor testified during the Hong Kong Proceedings in support of Vallat that he (Vallat) had been owed this money all along, and that these liabilities were omitted from the 1998, 1999 and 2000 financial statements, although they should have been disclosed. He never explained the reason for the omission and the Tribunal never addressed this issue.

**The Henderson Subpoena**

Both before and after this lawsuit was commenced, Plaintiffs and Third-Party Defendant would hear negative comments about Defendants Louis Bowen and James Collins-Taylor concerning other business ventures under their control. A simple internet search reveals that among these entities is a company called Montrose Food & Wine, a wine distribution business operating in China. See Locke Aff. Tab C. According to the moving papers, Montrose Food & Wine Limited ("Montrose Food & Wine") is a wholly-owned subsidiary of Montrose, which is a shell, "conduct[ing] no

operations" of its own. Declaration of David Henderson ("Henderson Decl.") ¶3. Further, Henderson admits that he works for Montrose Food & Wine, although he declines to specify any details. Id. Further research and investigation in support of Plaintiffs' claims has uncovered information that Mr. Henderson, both as an officer and shareholder in Montrose, was a victim of the same type of fraud that Plaintiffs' allege by the same Defendants.

Specifically, Plaintiffs have been advised, and seek to confirm through Mr. Henderson's deposition, that like with Phoenix, ACL invested in Montrose, in this case holding a little more than 50 percent of the company's stock. Through this investment, ACL took control over Montrose's finances, commingling Montrose's funds in an account with other ACL investee companies' money, and its corporate structure, namely the share register and stock certificates. ACL also controls a majority of the Montrose board of directors. Apparently, since Defendants took control of Montrose, there have been no shareholders' meetings and no board of directors' meetings, thereby preventing the other investors in the company from knowing what is happening with their money. More recently, Plaintiffs have been advised, and seek to confirm through Mr. Henderson's deposition, that ACL took funds from Montrose and invested in a brewery in either Hong Kong or China called the South China Brewery. Defendants advised Mr. Henderson, Montrose's President and an investor, that the brewery would cost $300,000. In reality it cost Montrose over $800,000 and was sold in bankruptcy for approximately $30,000. When James Collins-Taylor was asked about it, he stated that Montrose was lucky, the investment actually lost more than $1 million but Montrose was only stuck with $800,000 of the loss.

More recently, Plaintiffs believe that Defendant Louis Bowen invited Mr. Henderson to a meeting in Boston, requiring Henderson to fly in from Hong Kong, for which Bowen never showed up. Apparently, during the time Bowen knew Henderson was on the plane, Bowen arranged a meeting of some of the other U.S. investors who Henderson had brought into Montrose to address his (Bowen's) concerns with Henderson outside of Henderson's presence. A second reason to depose Mr. Henderson is to obtain his understanding as to why this happened.

This information is relevant and material to Plaintiffs' claims, because, as set forth below, at trial Plaintiffs are going to have to prove Defendants' fraudulent intent. One way of doing this is through a pattern of fraudulent conduct. In order to establish this pattern, Plaintiffs need to be able to take discovery from other non-party victims. Plaintiffs believe that Mr. Henderson may be one such victim with unique insight into Defendants' conduct because he wears so many hats with respect to Montrose, namely, director, officer-employee and investor. Based on these events, Plaintiffs served a subpoena dated June 30, 2005 on David Henderson, President of Montrose International Holdings Limited (BVI) and affiliated entities at One Atlantic Avenue in Newport, Rhode Island, the address indicated on the Montrose Food & Wine website as its "USA Offices" and Henderson concedes that he works there for Montrose Food & Wine. A copy of the subpoena is attached at Locke Aff. Tab D. Had Plaintiffs known this was Henderson's home address, he would have been served there personally.

## ARGUMENT

**THE MOTION TO QUASH SHOULD BE DENIED BECAUSE IT WAS LAWFULLY SERVED ON DAVID HENDERSON IN THE STATE IN WHICH HE RESIDES AND WORKS.**

**A. Rule 45 Standard.**

Any analysis of a motion to quash begins with a review of Rule 45 of the Federal Rules of Civil Procedure, which provides in relevant part:

> (a)(2) . . . A subpoena for attendance at a deposition shall issue from the court for the district designated by the notice of deposition as the district in which the deposition is to be taken. If separate from a subpoena commanding the attendance of a person, a subpoena for production or inspection shall issue form the court for the district in which the production or inspection is to be made.
>
> * * *
>
> (b) SERVICE.
>
> (1) A subpoena may be served by any person who is not a party and is not less than 18 years of age.
>
> * * *
>
> (c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
>
> * * *
>
> (3)(A) On a timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . . (iv) subjects a person to undue burden.

Fed. R. Civ. P. 45. A subpoena may be served on a corporation "through an officer." In re Grand Jury Subpoenas Issued to Thirteen Corps., 775 F.2d 43, 46 (2d Cir. 1985); see In re Grand Jury Subpoena Duces Tecum Addressed to Elec. & Music Indus., Ltd., 155 F. Supp. 892, 893 (S.D.N.Y. 1957) ("service upon a corporation may be made by delivering a copy of the subpoena to an officer"); see Boryk v. deHavilland Aircraft Co., 341 F.2d 666, 668-69 (2d Cir. 1965) (service on the president of a subsidiary held adequate; the label attached to the agent and the lack of explicit authority to accept service are not determinative).

Only the person to whom a subpoena is issued may move to quash. Smith v. Midland Brake, Inc., 162 F.R.D. 683, 685 (D. Kan. 1995). The movant on a motion to quash bears a "heavy burden of proof," and any showing of undue burden must be "specific," not general, requiring more than a claim of "significant commitment." Kirschner v. Klemons, 99 Civ. 4828 (RCC), 2005 U.S. Dist. LEXIS 9803 *5 (S.D.N.Y. May 18, 2005) (internal citations omitted); Jones v. Hirschfield, 219 F.R.D. 71, 74 (S.D.N.Y. 2003); Flatlow v. Islamic Republic of Iran, 196 F.R.D. 203, 207 (D.D.C. 2000); 9 James Wm. Moore, et al., Moore's Federal Practice § 45.04[3][b] (3d ed. 2004).

In this regard, the movant must set out the "manner and extent of the burden and the probable negative consequences of insisting on compliance. And inconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant testimony." Kirschner at *6; accord Cofield v. City of Legrange, 913 F. Supp. 608, 614 (D.D.C. 1996) (recognizing that quashing a subpoena is appropriate only where the information sought is "clearly irrelevant," noting that the threshold for relevancy is "not high," and that the information sought need not be admissible at trial); Broadcort Capital Corp. v. Flagler Securities, Inc., 149 F.R.D. 626, 629 (D. Colo. 1993) ("There is no legal basis for the subpoena duces tecum to be quashed, because the information sought is potentially relevant. . . ." ). Further, the fact that a subpoena seeks voluminous records does not render it invalid on undue hardship grounds, so long as the information requested is reasonably related to the issue it is sought to address. Northrop Corp. v. McDonnell Douglass Corp., 751 F.2d 395, 404 (D.C. Cir. 1984); Democratic Nat'l Comm. v. McCord, 356 F. Supp. 1394, 1396 (D.D.C. 1973); see Ghandi v. Police Dep't of the City of Detroit, 74 F.R.D. 115, 124 (E.D. Mich. 1977) (the fact that responding to a

subpoena would be time-consuming is insufficient to support a motion to quash). In fact, the courts have also recognized for 50 years that the Federal Rules applying to discovery, are to be "interpreted liberally" and a subpoena will not be quashed "unless it is palpable that the evidence sought can have no possible bearing on the issues." Sinva, Inc. v. Merrill Lynch, 65 Civ. 1566, 1967 U.S. Dist. LEXIS 11033 * 2 (S.D.N.Y. Jan. 11, 1967) (quoting Steamship Co. of 1949 v. China Union Lines, Hong Kong, 123 F. Supp. 802, 805 (S.D.N.Y. 1954)). Finally, objections to non-party subpoenas on relevance grounds are insufficient to support a motion to quash because the moving party generally has no interest at issue. Ghandi, 74 F.R.D. at 123.

Although the standard for discoverability is much lower than that for admissibility at trial, particularly relevant to the inquiry here is Rule 404(b) of the Federal Rules of Evidence, which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Fed. R. Evid. 404(b).

To prove securities fraud, Plaintiffs must establish fraudulent intent. See Shanahan v. Vallat, 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523 *11 (S.D.N.Y. Dec. 14, 2004) (decision on motion to dismiss in this case recognizing that Plaintiffs must plead facts sufficient to support a strong inference of fraudulent intent). It is axiomatic that in the context of fraud claims, evidence of a defendant's other fraudulent conduct is relevant and admissible to prove fraudulent intent. See, e.g., United States v. Sebaggala, 256 F.3d 59, 68 (1st Cir. 2001) ("Evidence of uncharged fraud activity that is

substantially similar to the activity underlying a charged fraud scheme often is admitted to show knowledge or intent to defraud with respect to the charged fraud scheme."); United States v. Guyon, 27 F.3d 723, 729 (1st Cir. 1994) (evidence of uncharged acts of fraudulent conduct is relevant and admissible to prove fraudulent intent). Further, objections that Rule 404(b) evidence might not be admissible at trial are improper in the discovery context where the evidence sought is reasonably calculated to lead to the discovery of admissible evidence. See Hershey Foods Corp. v. Collegiate Marketing, Inc., 95 Civ. 10526 (SAS), 1996 U.S. Dist. LEXIS 17698 (S.D.N.Y. Nov. 26, 1996) (permitting discovery of information calculated to lead to other acts of fraud perpetrated by the defendants against different victims).

**B. Montrose is unable to establish undue hardship.**

Applying these standards, Montrose's undue hardship argument is without merit because the information that Plaintiffs' seek access to is not only "potentially relevant" to their claims, it is likely admissible at trial under Fed. R. Evid. 404(b) to prove Defendants' fraudulent intent.

As set forth above, Plaintiffs have been advised, and seek to confirm through Mr. Henderson's deposition, that like with Phoenix, ACL invested in Montrose, and through this investment took control over Montrose's finances, its corporate structure, and the board of directors. Apparently, since Defendants took control of Montrose, there have been no shareholders' meetings and no board of directors' meetings, thereby preventing the other investors from knowing what is happening with their money. More recently, Plaintiffs have been advised, and seek to confirm through Mr. Henderson's deposition, that ACL took capital from Montrose and invested in a

brewery in Hong Kong or China called the South China Brewery. Defendants advised Mr. Henderson that the brewery would cost $300,000. In reality it cost Montrose over $800,000 and was sold in bankruptcy for approximately $30,000. When Defendant James Collins-Taylor was asked about it, he stated that Montrose was lucky, the investment actually lost more than $1 million but Montrose was only stuck with $800,000 of the loss.

More recently, Plaintiffs believe that Defendant Bowen invited Mr. Henderson to a meeting in Boston, requiring Henderson to fly in from Hong Kong. Bowen never showed up. Apparently, during the time Bowen knew Henderson was on the plane, Bowen arranged a meeting of some of the other U.S. investors who Henderson had brought into Montrose to address his (Bowen's) concerns with Henderson outside of Henderson's presence. A second reason to depose Mr. Henderson is to obtain his understanding as to why this happened.

Based on these events, Plaintiffs seek access to Montrose's corporate records, in order to ascertain the requirements for board of directors meetings and shareholders meetings, whether they were held, how often, when, what conduct was authorized and what was not, and financial records, to see whether, if any of the required meetings took place, the expenditures ultimately made on Montrose's behalf by Defendants were actually authorized. With access to this evidence, Plaintiffs seek to establish Defendants' unlawful fraudulent intent, as well as a pattern and scheme of fraudulent conduct of which Plaintiffs were victims. While the requests at issue may require production of a large quantity of documents, as set forth above, this alone is insufficient to quash the subpoena and there is no other effective way to conduct this

analysis without the requested documents. Further, when considering this motion the Court should note that Montrose actually submits no evidence whatsoever that the documents are in China or are voluminous or difficult to locate or transfer. The only two declarations submitted do not speak to this issue at all. See Henderson Decl.; Declaration of Ridley Whitaker (counsel for Defendants in the underlying New York action). Accordingly, Montrose has failed to sustain its "heavy burden" and this lack of support for Montrose's argument alone is sufficient to defeat the motion.

Nevertheless, consistent with the conversation between counsel, if the Court believes that the subpoena is overbroad, Plaintiffs reiterate the suggestion they made to Montrose's attorneys on July 22, 2005, to limit the document requests to responsive documents in Mr. Henderson's possession in Rhode Island, with the caveat that all formation documents should be produced as well as the minutes and resolutions of all board of directors meetings and shareholders meetings, and if Henderson makes reference to unavailable documents during his deposition, that they will subsequently be produced and the deposition continued. Accordingly, Montrose's undue hardship argument should be rejected and the motion to quash on this ground should be denied.

**C. Personal Jurisdiction Under Rule 45.**

Although not acknowledged in the moving papers, any personal jurisdiction analysis under Rule 45 begins with consideration of whether the person or entity served was found within the state in which he was service was made. In the seminal case of First American Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998), the Court of Appeals for the Second Circuit held that service upon a partner of a United Kingdom partnership while the partner was physically located in the State of New

York was effective as a matter of law and that no "minimum contacts" analysis under the state's long arm jurisdiction statute was necessary. Id. at 19; accord Driver v. Helms, 577 F.2d 147, 156-57 n.25 (1st Cir. 1978), rev'd sub. nom on other grounds, Stafford v. Briggs, 444 U.S. 527, 100 S. Ct. 774 (1980) ("A state boundary is still a significant jurisdictional demarcation because if a defendant is found and served within the state, minimum contacts need not be established, and jurisdiction may be asserted on the basis of state sovereignty"). This was because under New York law CPLR § 310, personal service on a partner located within the state is sufficient to confer jurisdiction on the partnership. First Amer. Corp., 154 F.3d at 19 (citing N.Y. Civ. Prac. L. & R. § 310, providing for such service).

The Second Circuit reached this conclusion relying on the United States Supreme Court's decision in Burnham v. Superior Court, 495 U.S. 604, 110 S. Ct. 2105 (1990) which rejected any due process challenge to service on a New Jersey resident served with process only while passing though California. First Amer. Corp., 154 F.3d at 20 (recognizing that the distinction between service of process as a defendant and service of a subpoena as a non-party does not alter the analysis). Similar to CPLR § 310, which was the focus of the First American Corp. decision, Superior Court Rule 4(e)(3) of the Rhode Island Superior Court Rules of Civil Procedure provides for service upon a corporation by service upon an "officer, a managing or general agent, or . . . leaving a copy of the summons or complaint at an office of the corporation with a person employed therein." R.I. Sup. Ct. R. 4; Theta Properties v. Ronci Realty Co., Inc., 814 A.2d 907, 911-12 (R.I. 2003). Accordingly, and contrary to Montrose's argument, where a corporate officer resides within the state of Rhode Island, or the corporation maintains an

office there in which the officer works, the officer and the company are amenable to service of a subpoena there without a minimum contacts analysis.[2]

**D. The Court has personal jurisdiction over Henderson and Montrose.**

Once the correct standard is applied, it becomes clear that Montrose's motion to quash for lack of personal jurisdiction should be denied on several grounds. Initially, the subpoena was served on David Henderson specifically at home in the state in which he resides, and not Montrose generally. Because Henderson lives in Rhode Island at the address he was served with the subpoena, both he and Montrose are subject to subpoena there under Fed. R. Civ. P. 45(a)(2). No minimum contacts analysis is required and the motion should be denied in this ground alone. See First Amer. Corp., 154 F.3d at 19.[3]

Moreover, even if the minimum contacts analysis were required, there is sufficient contact for this Court to assume jurisdiction over Henderson and Montrose for the purpose of a non-party subpoena. Henderson is Montrose's President. Montrose is a holding company that "conducts no operations" and has a primary asset, Montrose Food & Wine, an intermediate holding company whose function is not specifically explained, and no secondary asset is identified. Henderson Decl. ¶¶ 1, 3, 5. Henderson also works for Montrose Food & Wine at the address he was served in Rhode Island and the address that Montrose Food & Wine advertises to the public as its "USA Offices." Id. ¶ 6; Locke

---

[2] This is the only rule that makes sense. Applying Montrose's view of the law to the facts here would read tag jurisdiction out of any personal jurisdiction analysis, which is clearly not the law.

[3] In this regard, the Court should note that if Plaintiffs were led to believe that the address where Henderson was served was his home and not a full blown office, they would have served him there in his personal capacity. Further, on July 22, 2005 during a phone conversation, Plaintiffs' counsel specifically stated to Montrose's attorneys that regardless of the position that Montrose took in its motion to quash, counsel wanted to know who represented Henderson personally because no matter what the outcome, Plaintiffs still specifically wanted Henderson's personal testimony. Plaintiffs' counsel never received an answer to this question.

Aff. Ex. A. No other information is given. Based on these few pieces of evidence, the Court can only conclude that Montrose maintains sufficient minimum contacts with Rhode Island sufficient to enforce the subpoena as to both Henderson and Montrose and the movant has failed to satisfy its "heavy burden" sufficient to grant the requested relief.[4]

The fact that Montrose goes to some length to create a distinction between Montrose and Montrose Food & Wine is of no significance. As set forth above, the only evidence Montrose submits is that Henderson is President of Montrose, a company with no operations, and he works for Montrose Food & Wine out of his home in Rhode Island where he was served with a subpoena—an address Montrose Food & Wine represents to the public is its "USA Offices." No other information is provided. Under these circumstances, Montrose cannot be permitted to hide behind some type of artificial corporate form to support a motion to quash and prevent Plaintiffs from obtaining evidence directly relevant and likely admissible in support of the their claims. As a result, the motion to quash should again be denied in its entirety.

## CONCLUSION

For all of the forgoing reasons, Montrose's motion to quash should be denied in its entirety, and the witness should be directed to produce responsive

[4] The case law Montrose relies upon is inapposite. In In re Jee, 104 B.R. 289 (C.D. Cal. Bankr.. 1989), the subpoena was addressed to the custodian of records for a corporation, not a specific individual residing in the state whose testimony was sought. Similarly, the court in Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc., 45 F.R.D. 515 (S.D.N.Y. 1968) declined jurisdiction where the only employee present in the state was secretary and receptionist doing "ministerial" and "non-discretionary" work, not the President of the company who admitted to doing work in the state and maintaining his home there. Further, that case does not indicate in any way that the subpoena was directed to a specific individual. Central Tools, Inc. v. Chicago Brands Indus., Inc., CA 03-591-ML, 2004 U.S. Dist. LEXIS 27062 (Apr. 28, 2004) is wholly distinguishable, dealing with a motion to dismiss a corporation who had virtually no meaningful contact with Rhode Island, not a subpoena to a Rhode Island resident, who is president of a company that holds itself out to the public as maintaining its "USA Offices" in Rhode Island.

documents and appear for his deposition, together with such other relief as this Court deems just, equitable and proper.

Dated:
August 16, 2005

Respectfully submitted,
*Attorneys for Plaintiffs & Third-Party Defendant William S. Shanahan and Antares LLC.*

Richard Nadeau, Jr. (No. 2861)
Nadeau & Simmons, P.C.
56 Pine Street
Providence, Rhode Island 02903
Ph: (401) 272-5800
Fax: (401) 272-5858

Thomas J. Cronin (No. 5302)
Gunning & LaFazia, Inc.
56 Pine Street
Providence, RI 02903
Ph: (401) 521-7977
Fax: (Fax) 521-6901

CARABBA LOCKE LLP
Steven I. Locke (SL 4859)
100 William Street, Suite 310
New York, New York 10038
(212) 430-6400

Certificate of Service

I hereby certify that I am over 18 years of age and not a party to this action. On August 16, 2005, I caused to be served the foregoing Objection to the Motion to Quash of Montrose International Holdings Limited (BVI) by regular mail upon Geoffry w. Millsom, Adler Pollock & Sheehan, P.C., One citizens Plaza, 8th Floor, Providence RI 02903 and Marc Kasowitz, Christopher Johnson, and Courtney Ozer Dichristfaro, Kasowitz, Benson, Torres & Friedman, LLP. 1633 Broadway, NY, NY 10019.