**IN THE**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

------------------------------------------------------------------X

WILLIAM S. SHANAHAN and
ANTARES, LLC,

Plaintiffs,

-against-

MAURICE VALLAT, JAMES COLLINS-TAYLOR,
LOUIS BOWEN, ACL NOMINEES LTD. ACL
HOLDINGS LIMITED and ACL ASIA LIMITED,
Defendants.

------------------------------------------------------------------X

JAMES COLLINS-TAYLOR, LOUIS BOWEN,
ACL NOMINEES LTD., and ACL HOLDINGS
LIMITED,

Third-Party Plaintiffs,

-against-

ROSE-MARIE FOX,

Third-Party Defendant.

------------------------------------------------------------------X

MISC 05 0093-ML

Case pending in the
U.S. District Court, S.D.N.Y.

03 Civ. 3496 (MBM)

**AFFIDAVIT OF**
**<u>STEVEN I. LOCKE</u>**

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

STEVEN I. LOCKE, being duly sworn, deposes and says:

1. I am an attorney with the law firm of Carabba Locke LLP, 100 William Street, New York, New York 10038, counsel for Plaintiffs William Shanahan and Antares, LLC and Third-Party Defendant Rose-Marie Fox in the above-captioned securities fraud action pending the United States District Court for the Southern District of New York.

2. I am fully familiar with the facts and circumstances stated herein and submit this affidavit in opposition to the Motion of Montrose International Holdings Limited (BVI) ("Montrose") to Quash the Subpoena Directed Toward It By William S. Shanahan and Antares, LLC. For the reasons set forth below and in the accompanying Memorandum of Law in Opposition to the Motion to Quash, the Motion should be denied and the witness, David Henderson, should be directed to produce responsive documents and appear for his deposition.

3. The motion to quash is based on two arguments, both without merit. Initially, Montrose argues that the subpoena is a "fishing expedition." Not true. As set forth below, Plaintiffs have good cause to believe that David Henderson, who is not only the President of Montrose, but also a shareholder and a director who lives in Rhode Island, has in his possession both relevant and admissible evidence in the case pending before the Court in the Southern District of New York. Moreover, according to the limited investigation Plaintiffs have been able to conduct so far, both Mr. Henderson and Montrose have a sufficient nexus to Rhode Island for him to be subject to a subpoena there.

4. At the outset, the Court should be aware that on July 22, 2005, I received a call from counsel for Montrose asking Plaintiffs to withdraw the subpoena and stating that Montrose would move to quash if we did not. Counsel also explained that the documents requested were voluminous and located mostly in China. Plaintiffs declined to withdraw the subpoena but offered to accept only those responsive documents located in Rhode Island along with Mr. Henderson's testimony, and then make a further request if that proved necessary depending on Mr. Henderson's testimony. Montrose's counsel

declined and then requested an extension of time to file the motion and Plaintiffs consented. During the conversation, I specifically asked counsel whether he also represented David Henderson individually because the subpoena was addressed to him specifically, not Montrose generally. The reason it was addressed to Mr. Henderson at a Montrose address in Rhode Island is that Montrose identifies the Rhode Island address as its "USA offices" on its internet website freely available to anyone with internet access. See Tab A (internet printout). If Plaintiffs had known that this was simply Henderson's home address, the subpoena would have been addressed to him there personally. In any event, counsel responded that he would look into it and let me know. I never heard back. At this point, Plaintiffs now reiterate to the Court that they seek both documents and deposition testimony from David Henderson because they believe that he specifically has information relevant and material to Plaintiffs' claims.

**Plaintiffs' claims**

5. As set forth in the Amended Complaint, Plaintiffs instituted the above captioned action in the United States District Court for the Southern District of New York, alleging that Plaintiffs were fraudulently induced to invest in a company known as Phoenix Telecommunication Limited ("Phoenix" or the "Company"), which is in the business of financing a paging project in China. See Tab B (Amended Complaint).

6. The following facts constitute a summary of the allegations set forth in the Amended Complaint. Plaintiffs claim that they were fraudulently induced to make their investments, totaling $3,737,906, by certain financial statements concerning the Company. These financial statements were compiled and provided to Plaintiffs by Defendants: Maurice Vallat, Phoenix's Chairman of the Board of Directors (the

"Board") at all times relevant to Plaintiffs' claims; ACL Nominees Ltd., ACL Holdings Limited and ACL Asia Ltd., (collectively "ACL") which acted as the Company's corporate secretary, financial advisor and escrow agent, compiling Phoenix's financial statements for the years 1998 and 1999; James Collins-Taylor, ACL's Executive Director (and a Phoenix Board member from June 1998 until May 21, 2001); and Louis Bowen, ACL's founder and Managing Director. Collins-Taylor and Bowen maintain day-to-day control over ACL. Through ACL, Collins-Taylor and Bowen exerted tremendous influence over Phoenix, and they were intimately involved in the Company's financial activities, maintaining exclusive control over Phoenix's accounts and corporate books.

7. Beginning in December 1999, when Phoenix was experiencing financial difficulties, Shanahan was approached by his wife, Third-Party Defendant Rose-Marie Fox, who also sat on Phoenix's Board, to inquire as to whether he would be interested in investing in the Company. Shanahan responded that he would consider it, but that he wanted, among other things, to review Phoenix's financial statements first.

8. On March 23, 2000, Shanahan was provided with financial statements for the years 1998 and 1999. These statements, which were the first ever produced for Phoenix, were compiled by ACL, controlled by Collins-Taylor and Bowen, and approved and forwarded to Shanahan by Vallat. Based on these financial statements, Shanahan invested a total of $2.2 million between March and October 2000. In November 2000, Phoenix produced another set of financial statements current through October 31, 2000. These statements were compiled by Vallat and provided to Shanahan for the purpose of allowing him to consider whether to provide further funding to

Phoenix. Based on the 1998, 1999 and 2000 financial statements, Shanahan, and later Antares, LLC, invested another $1,537,906.

9. More recently however, it has become clear that these financial statements, provided by Defendants, contain material omissions and misrepresentations, all of which would have impacted Plaintiffs' investment decisions with respect to Phoenix had the truth been known, and that Defendants have engaged in other fraudulent conduct. Among this conduct is that Defendants tampered with Phoenix's share register for their own benefit and the benefit of their clients, all to the detriment of the other shareholders including Plaintiffs.

10. Other suspicious conduct includes ACL commingling Phoenix's funds in a general account with funds of other corporations unrelated to Phoenix but in which ACL, Collins-Taylor and Bowen maintain an interest. This commingling made it difficult, if not impossible, to monitor how ACL was spending the Company's capital. Plaintiffs have learned however, that this commingling permitted Defendants to take Phoenix's funds and loan them to another company known as Green Cartridge Corp. ("GCC") for GCC's benefit during September and October 1999 without Phoenix's knowledge or consent. GCC has no relationship to Phoenix whatsoever.

11. Further, because ACL controlled Phoenix's financial accounts, Bowen and Collins-Taylor were able to take for themselves a $25,000 commission from Phoenix to satisfy a debt purportedly owed by a predecessor corporation, SinoAmerican Telecomm Inc., for fundraising in December 1998. Bowen, Collins-Taylor and ACL took this money from Phoenix despite the fact that Sino and Phoenix are separate companies and knowing that Sino was going through liquidation proceedings in the Hong

Kong Court which they themselves instigated, and where claims against Sino should have been filed. Further, all funds raised by ACL for Sino had been returned to the investors in February 1998, months prior to ACL taking these fees and prior to Phoenix's formation, and ACL knew this because it controlled Sino's escrow account at this time. As a result, in accordance with common corporate fundraising practice, ACL was never owed any commission by Sino or Phoenix. In any event, this payment was never disclosed in any of the Company's financial statements provided to Plaintiffs and was not discovered until an audit was conducted of the general ledger maintained by ACL.

12. Another example of ACL's manipulation was that it was able to have Phoenix pay the entire salary of one of its employees, Christopher Page, from October 1998 through September 1999, despite the fact that Page only spent a fraction of his time working as a "consultant" on Phoenix-related matters. This salary arrangement was contrary to ACL's agreement with the Company that Phoenix would only pay that portion of Page's salary that corresponded with the percentage of his time he spent actually working for the Company. This alternate arrangement occurred without being disclosed to anyone on the Board of Directors or in the financial statements.

13. On December 19, 2002, Phoenix terminated Defendant Vallat for poor performance and a variety of other improprieties. In November 2002, prior to Vallat's termination, he attempted to negotiate a severance package on his own behalf. After these negotiations, Plaintiffs learned for the first time that Vallat purportedly had a formal employment contract with Phoenix's wholly owned subsidiary, Phoenix Telecommunication(Hong Kong) Limited ("Phoenix(HK)") dated February 1, 2000 and signed by Collins-Taylor and Vallat. According to the terms of this contract, Vallat was

to work full-time and be paid $9000 per month in salary. Neither Vallat, nor Collins-Taylor ever told the Phoenix Board of Directors about this contract prior to December 2002 in an effort to hide this lower salary from the Company and allow Vallat to obtain higher compensation, which he did. The only reason the contract was ever disclosed was because in March 2002, Phoenix(HK)'s corporate secretary, an outside accounting firm controlled by Vallat, needed the contract so that Vallat could obtain work papers to stay in Hong Kong.

14. On January 30, 2003, Vallat commenced an action in the Labour Tribunal of Hong Kong (the "Tribunal"), LBTC No. 925 of 2003, against Phoenix, in which he claimed for the first time that he was entitled to back wages for the years 1998 through 2002 ("Hong Kong Proceedings"). These claims were based on Vallat's assertion that his salary during this period was $13,833 per month, as opposed to the lower amounts reported in the Company accounts. This claim was never disclosed to the Phoenix Board prior to these proceedings despite years of alleged underpayment and was not identified as a liability or otherwise in any of Phoenix's financial statements issued by Defendants and forwarded to New York for Shanahan's review. Collins-Taylor testified during the Hong Kong Proceedings in support of Vallat that he (Vallat) had been owed this money all along, and that these liabilities were omitted from the 1998, 1999 and 2000 financial statements, although they should have been disclosed. He never explained the reason for the omission and the Tribunal never addressed this issue.

**The Henderson Subpoena**

15. Both before and after this lawsuit was commenced, Plaintiffs and Third-Party Defendant would hear negative comments concerning Defendants Louis

Bowen and James Collins-Taylor concerning other business ventures under their control. A simple internet search reveals that among these businesses is an entity called Montrose Food & Wine, a wine distribution company operating in China. See Tab C. Further research and investigation in support of Plaintiffs' claims has uncovered information that Mr. Henderson, both as an investor and shareholder in Montrose, was a victim of the same type of fraud that Plaintiffs' allege by the same Defendants (exclusive of Maurice Vallat).

16. Specifically, we have been advised, and we seek to confirm through Mr. Henderson's deposition, that like with Phoenix, ACL invested in Montrose, holding a little more than 50 percent of Montrose's stock. Through this investment, ACL then took control over Montrose's finances, commingling Montrose's funds in an account with other ACL investee companies' money, and its corporate structure, namely the share register and stock certificates. ACL also controls a majority of the Montrose board of directors. Apparently, since they took control of Montrose, there have been no shareholders' meetings and no board of directors' meetings, thereby preventing the other investors in the company from knowing what is happening with their money. More recently, we have been advised, and seek to confirm through Mr. Henderson's deposition, that ACL took funds from Montrose and invested in a brewery in either Hong Kong or China called the South China Brewery. They advised Mr. Henderson, Montrose's President and an investor, that the brewery would cost $300,000. In reality it cost Montrose over $800,000 and was sold in bankruptcy for approximately $30,000. When James Collins-Taylor was asked about it, he stated that Montrose was lucky, the

investment actually lost more than $1 million but Montrose was only stuck with $800,000 of the loss.

17. More recently, we believe that Defendant Louis Bowen invited Mr. Henderson to a meeting in Boston, requiring Henderson to fly in from Hong Kong, for which Bowen never showed up. Apparently, during the time Bowen knew Henderson was on the plane, Bowen arranged a meeting of some of the other U.S. investors who Henderson had brought into Montrose to address his (Bowen's) concerns with Henderson outside of Henderson's presence. A second reason to depose Mr. Henderson to obtain his understanding as to why this happened.

18. This information is relevant and material to Plaintiffs' claims, because, as set forth in the memorandum of law submitted herewith, at trial Plaintiffs are going to have to prove Defendants' fraudulent intent. One way of doing this is through a pattern of fraudulent conduct. In order to establish that pattern, Plaintiffs need to be able to take discovery from other non-party victims. Plaintiffs believe that Mr. Henderson may be one such victim with unique incite into Defendants' conduct because he wears so many hats with respect to Montrose, namely, director, officer-employee and investor. Based on these events, Plaintiffs served a subpoena dated June 30, 2005 on David Henderson as President of Montrose International Holdings Limited (BVI) and affiliated entities at One Atlantic Avenue in Newport, Rhode Island, the address indicated on the

company website as its "USA Offices." A copy of the subpoena is attached at Tab D. Had Plaintiffs thought this was Henderson's home address, he would have been served there personally.

STEVEN I. LOCKE

Sworn to before me this
12th day of August, 2005

Notary Public

FREDRICK A. SCHULMAN
Notary Public, State of New York
No. 02SC6019347
Qualified in New York County
Commission Expires February 8, 2007